# Exhibit A

(consisting of the following 36 pages)

**The Verified Complaint**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

DIGITAL MEDIA SOLUTIONS, LLC )     CASE NO.     1:19-cv-145
4800 140th Avenue N. )
Suite 101 )     JUDGE
Clearwater, FL 33762, )
  )     **VERIFIED COMPLAINT**
      Plaintiff, )
  )
   v. )
  )
SOUTH UNIVERSITY OF OHIO, LLC )
a/k/a DC SOUTH UNIVERSITY OF OHIO, )
LLC dba SOUTH UNIVERSITY )
4743 Richmond Road )
Warrensville Heights, Ohio  44128 )
  )
Serve also: )
c/o Corporation Service Company, )
Statutory Agent )
50 West Broad Street, Suite 1330 )
Columbus, OH 43215 )
  )
     and )
  )
DCEH EDUCATION HOLDINGS, LLC )
c/o Corporation Service Company )
Statutory Agent )
8825 N. 23rd Avenue, Suite 100 )
Phoenix, AZ  85021 )
  )
     and )
  )
ARGOSY EDUCATION GROUP, LLC )
601 S. Lewis St. )
Orange, CA 92868 )
  )
     Defendants. )

     Plaintiff Digital Media Solutions, LLC ("DMS"), by and through undersigned counsel,

for its Complaint against Defendants DCEH Education Holdings, LLC ("DCEH"), South

University of Ohio, LLC ("SUO"), and Argosy Education Group, LLC ("Argosy") states as follows:

## INTRODUCTION

1.     DMS, founded by a team of lifelong athletes, specializes in helping its clients accelerate their growth by deploying diversified and data-driven digital media customer acquisition solutions. DMS provided those services generally, and student lead generation specifically, to DCEH and some of its subsidiary entities, including SUO and Argosy. It invoiced DCEH and its subsidiaries, including SUO and Argosy, a total of $252,737, which remains unpaid.

2.     DMS brings this action for breach of contract, on account, unjust enrichment, and to appoint a receiver over DCEH and its subsidiaries to ensure an orderly wind down of those entities for the benefit of their creditors, including DMS, and all other interested parties.

## PARTIES

3.     DMS is a Delaware limited liability company. Its members consist of:

    a.     Prism Data, LLC, a Delaware limited liability company with its principal place of business in New York. The members of Prism Data, LLC are the following individuals: Joseph Marinucci (a resident of Florida); Fernando Borghese (a resident of Pennsylvania); Matthew Goodman (a resident of Florida); and Luis Ruelas (a resident of New Jersey);

    b.     CEP V-A DMS AIV Limited Partnership, a limited partnership organized under the laws of the State of Delaware with its principal place of business in Toronto, Ontario; and

{797046; 1425-0001}

2

      c.      CEP V DMS US Blocker Company, a corporation incorporated under the laws of the State of Delaware with a principal place of business in Toronto, Ontario.

4.      SUO is an Arizona nonprofit limited liability company with its principal place of business in Cuyahoga County, Ohio. SUO's sole member is South University Savannah, LLC. South University Savannah, LLC's sole member is DCEH South University, LLC. DCEH South University, LLC's sole member is DCEH. As noted, DCEH's sole member is Dream Center Foundation, a California nonprofit corporation with its principal place of business in Los Angeles, California. Therefore, SUO is a citizen of the State of California.

5.      DCEH is an Arizona not for profit limited liability company. Its sole member is Dream Center Foundation, a California nonprofit corporation with its principal place of business in Los Angeles, California. Therefore, DCEH is a citizen of the State of California. *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (holding that a limited liability company has the citizenship of its members, like a partnership).

6.      Argosy is a California not for profit limited liability company. Its sole member is DCEH Argosy University of California, LLC. DCEH Argosy University of California, LLC's sole member is DCEH. As noted, DCEH's sole member is Dream Center Foundation, a California nonprofit corporation with its principal place of business in Los Angeles, California. Therefore, Argosy is a citizen of the State of California.

## JURISDICTION AND VENUE

7.      This Court has original diversity jurisdiction over this matter under 28 U.S.C. § 1332(a) in that this is a suit between citizens of different States and the amount in controversy exceeds $75,000.

{797046; 1425-0001}

8.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in the Complaint occurred in this district and because SUO's principal place of business is in this district.

## FACTS COMMON TO ALL COUNTS

9.      In January 2013, One on One Marketing, LLC ("One on One") entered into the DoublePostive Online Marketing Agreement for EDMC Institutions (the "Agreement") (attached as Ex. A) with DoublePositive Marketing Group, Inc. ("DP") and Education Management, LLC ("EDMC").

10.     One on One subsequently assigned its rights and obligations under the Agreement to DMS.  Likewise, EDMC subsequently assigned its rights and obligations under the Agreement to DCEH.

11.     DCEH is the holding company for SUO and two university systems: Argosy Universities and a group of Art Institutes (collectively, the "Universities"). Argosy is the parent company for the Argosy University system.

12.     The Universities primarily serve what might be deemed non-traditional students like unemployed (or underemployed) adults who are seeking to obtain particularly marketable job skills to gain new careers with higher wages.

13.     Pursuant to the Agreement, DMS agreed to generate for DCEH, SUO, Argosy and others identity and contact information for prospective students for the Universities. In other words, DMS agreed to source leads for DCEH and its affiliates.

14.     DMS did so. During the course of the Agreement, DMS generated many leads for DCEH and the Universities. Specifically, DMS generated leads for SUO and Argosy.

{797046; 1425-0001}

15.     Under the Agreement, DCEH agreed to pay DMS fees for each qualified lead that DMS generated and the reasonable billing rates of DMS.

16.     DCEH agreed to pay DMS's invoices within 30 days.

17.     Between August 2018 and November 2018, DMS issued 21 invoices to DCEH and the Universities. These invoices total the sum of $252,737.

18.     Despite DMS's demand for payment, DCEH and the Universities have failed to pay.

## COUNT ONE
## (Breach of Contract)

19.     DMS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten.

20.     DCEH contracted with DMS for the generation of lead information, which constitutes a binding and enforceable agreement between the parties.

21.     DMS performed all of its obligations under the contract.

22.     DMS issued many invoices to DCEH to collect payment, but it has not received payment for the last 21 invoices.

23.     To date, DCEH and the Universities have a balance due and owing of $252,737.

24.     Despite demand for payment, DCEH has refused to pay DMS and therefore, it has breached the terms of the Agreement.

25.     As a direct and proximate result of DCEH's breach, DMS has been damaged in the amount of $252,737, plus interest, costs, and expenses.

{797046; 1425-0001}

5

## COUNT TWO
### (Balance Due on Account)

26.     DMS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten.

27.     DCEH owes DMS the sum of $252,737 on account for the lead generation services provided by DMS to DCEH.

28.     DMS has demanded payment on account but, to date, DCEH has refused to pay the balance due and owing.

29.     As a direct and proximate result of DCEH's breach, DMS has been damaged in the amount of $252,737, plus interest, costs, and expenses.

## COUNT THREE
### (Unjust Enrichment)

30.     DMS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten.

31.     At DCEH's request and for its benefit and the benefit of Argosy and SUO, DMS provided services (lead generation) to DCEH, Argosy, and SUO.

32.     DCEH, Argosy, and SUO have knowledge of these benefits.

33.     Retention of these benefits by DCEH, Argosy, and SUO without payment to DMS would be unjust.

34.     As a direct and proximate result of DCEH's breach, DMS has been damaged in the amount of $252,737, plus interest, costs, and expenses.

## COUNT FOUR
### (Appointment of a Receiver)

35.     DMS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten.

{797046; 1425-0001}

6

36.     This Court has the power to grant ancillary relief, including the appointment of a receiver.

37.     This Court has the power to appoint a receiver whenever such appointment is deemed necessary. Here, a receivership is warranted because it is the only mechanism that serves to protect all interested parties: specifically the students who would otherwise face suddenly shuttered schools, creditors who would otherwise face recovering far less as the enterprise value is destroyed, and taxpayers who would otherwise face the burden of tens of millions of dollars of canceled student loans arising out of suddenly shuttered schools. The key to protecting the students, creditors, and taxpayers revolves around DCEH schools remaining eligible to receive Title IV monies to be used to pay operating expenses, pay creditors, and provide the educational services to the students. A bankruptcy would end that eligibility, resulting in exceptional and immediate harm to the students, and the inability of the enterprise to maximize its value for the benefit of its creditors, students, and other interested parties. A Receivership, however, would allow the valuable assets to be sold at non-distressed prices, a proper teach-out for the students, and appropriate wind-up of the dozens of entities owned by DCEH, including SUO and Argosy.

38.     DMS believes that DCEH, its related subsidiary entities, the students at the Universities, and the creditors of DCEH and the Universities will suffer immediate and irreparable harm unless a receiver is immediately appointed.

39.     DMS urges the Court for the immediate appointment of Mark Dottore of Dottore Companies, LLC to serve as Receiver with the powers and authority described in the Emergency Motion for Appointment of Receiver and proposed order filed contemporaneously with this Complaint.

{797046; 1425-0001}

7

**WHEREFORE**, DMS prays that this Court enter judgment in DMS's favor and against DCEH, Argosy, and SUO upon the Complaint, and that it be awarded attorneys' fees and such other relief as this Court finds just and equitable.

Respectfully submitted,

/s/ *Audrey K. Bentz*
STEVEN G. JANIK (0021934)
AUDREY K. BENTZ (0081361)
JANIK L.L.P.
9200 South Hills Blvd., Suite 300
Cleveland, Ohio 44147
Phone: (440) 838-7600 * Fax: (440) 838-7601
Email: Steven.Janik@janiklaw.com
        Audrey.Bentz@janiklaw.com

*Counsel for Plaintiff*

{797046; 1425-0001}

8

STATE OF FLORIDA       )

COUNTY OF Pinellas    )        **VERIFICATION**

        I, **JOE MARINUCCI**, being over the age of majority and sworn according to law, say and

depose as follows:

        1.      I am the CEO of Plaintiff Digital Media Solutions, Inc. ("DMS").

        2.      In my capacity as CEO of DMS, I have read the foregoing Verified Complaint, and

the factual allegations contained therein are true and accurate to the best of my personal

knowledge, information, and belief.

JESSICA ROGERS
MY COMMISSION # GG 032501
EXPIRES: September 21, 2020
Bonded Thru Notary Public Underwriters

_____
JOE MARINUCCI

Sworn to and subscribed before me this ___18___ day of January, 2019.

_____
Notary Public, State of Florida

## DOUBLEPOSITIVE ONLINE MARKETING AGREEMENT
## FOR EDMC INSTITUTIONS

This DoublePositive Online Marketing Agreement for EDMC Institutions (this "Agreement") is by and among DoublePositive Marketing Group, Inc., a Delaware corporation ("DP"), having a place of business at First Mariner Building, 1501 S. Clinton Street, Suite 1520, Baltimore, MD 21224, Education Management LLC, a Delaware limited liability company (together with its subsidiaries and affiliates, "EDMC"), having a place of business at 210 Sixth Avenue, 33rd Floor, Pittsburgh, PA 15222, and the party executing this Agreement on the signature page hereof as the Vendor ("Vendor"), and is effective as of the later of the date on which it is signed by DP, EDMC and Vendor (the "Effective Date"). DP, EDMC and Vendor are each referred to herein as a "party," and collectively, as the "parties".

WHEREAS, DP and EDMC are parties to a Master Strategic Marketing Agreement (the "SMA") pursuant to which, among other things, DP is to acquire Qualified Leads (as hereinafter defined) for the benefit of EDMC's educational institutions (the "EDMC Institutions");

WHEREAS, Vendor is in the business of providing marketing and advertising services, including the generation of Lead Contact Information (as hereinafter defined); and

WHEREAS, DP, EDMC and Vendor desire to enter into this Agreement under which Vendor will supply to DP the services described in this Agreement so that DP can provide to EDMC the services described in the SMA.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   DEFINITIONS

As used in this Agreement, the following capitalized terms shall have the meanings set forth below. Other terms are defined in the text of this Agreement and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

1.1   Duplicate Lead – Lead Contact Information provided by Vendor to DP that is duplicative in any material respect to information received by EDMC (for any EDMC Institution) from any source (including, without limitation, from the Vendor, from DP and from direct contact with EDMC) within the one hundred eighty (180) day period prior to (including prior to the Effective Date) the delivery of such Lead Contact Information by Vendor to DP. Vendor acknowledges and understands that any determination by DP as to whether Lead Contact Information constitutes a Duplicate Lead shall be final and binding on Vendor.

1.2   EDMC Creative Content – Graphical and text images, graphical and text newsletters, printed material, documents, marks, logos, videos, electronic recordings, photographs, slides, themes, scripts, micro-sites, websites and other materials that are (a) generated by or for Vendor solely for the benefit of DP and/or EDMC under this Agreement, (b) generated by or for Vendor solely for the benefit of DP and/or EDMC so as to generate Lead

Contact Information, or (c) generated by or for Vendor solely for the benefit of DP and/or EDMC using EDMC Content (defined below).

     1.3    <u>False Lead</u> – Any Lead Contact Information that: (a) is patently false or misleading; (b) is determined by DP or EDMC to contain false or misleading information; (c) is determined by DP or EDMC to be the result of a multiple-submit error (defined as submitting the same information more than once within a 24-hour period); (d) is fraudulently developed (e.g., (i) not derived from an individual who actually and purposely requested information from an educational institution, (ii) lead delivery to DP was intentionally delayed, and (iii) re-submission of previously submitted Lead Contact Information by Vendor when said re-submission does not originate from the individual, unless approved in advance by DP); (e) relates to an individual under the age of thirteen (13); (f) relates to an individual who cannot be contacted by telephone based on the information provided; (g) relates to an individual who is not interested in educational products or services; (h) relates to an individual (the "Subject") whose telephone number is answered by a person (which may be the Subject or may be another person) who denies that the Subject may be contacted at such telephone number or who provides other false information about the Subject; or (i) is acquired or generated in violation of the terms of this Agreement.

     1.4    <u>Incentivized Lead</u> – Any Lead Contact Information that is generated from an incentivized advertising or incentivized registration process, including, but not limited to, lead generation from a source related to an employment opportunity or from a source related to an educational scholarship. For the avoidance of doubt, marketing and advertising programs that employ "pseudo-incentivized" registration offers (e.g., with language that is not clear and conspicuous, the user is informed (i) that the user should complete the form only if he or she has a genuine interest in the offer presented and/or (ii) the user will not receive any additional rewards for filling out the information) will be considered co-mingling of incentivized advertising and school marketing and will constitute an Incentivized Lead, regardless of any corresponding disclosure.

     1.5    <u>Insertion Order</u> - Any order for Qualified Leads or Qualified Transfers pursuant to this Agreement. Each Insertion Order shall be in the form provided to Vendor by DP from time to time (as it may be amended by DP from time to time). In the event of any conflict between this Agreement and an Insertion Order, the provisions of the Agreement shall control unless modified in the Insertion Order in writing with reference to the specific section of this Agreement that is being modified.

     1.6    <u>Intellectual Property</u> – All intellectual property, including, but not limited to, patents, trademarks, trade dress, copyrighted works or any other proprietary information owned or licensed by DP or EDMC and provided to Vendor solely for purposes of this Agreement, including, but not limited to, the EDMC Content and the EDMC Creative Content.

     1.7    <u>Lead Contact Information</u> – Identity and contact information provided by Vendor to DP for any individual interested in potentially obtaining goods or services from an EDMC Institution.

    1.8    Permissible Payment Terms – Under this Agreement, Permissible Payment Terms shall mean: (a) A reasonable flat fee per Qualified Lead that includes contact information for a prospective student where such fee is not based on: (i) any additional conduct or action by the third party or the prospective student, such as participation in preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution or attendance at such an appointment, or the signing, or being involved in the signing, of a prospective student's enrollment agreement or financial aid application;; or (ii) the number of students (calculated at any point in time of an educational program) who apply for enrollment are awarded financial aid, or are enrolled for any period of time, including through completion of an educational program, at an EDMC Institution; (b) a reasonable flat fee for services that is based solely on Vendor's costs associated with providing services under this Agreement, plus a percentage of those costs to provide the third party reasonable profit under the agreement, provided such flat fee is not based directly or indirectly on measures related to actual or anticipated enrollments in EDMC Institutions; (c) reasonable assigned billing rates Vendor; or (d) payment terms approved in advance by EDMC. Notwithstanding anything to the contrary contained herein, payment terms which are per impression (*i.e.*, did the ad appear) and/or per click constitute Permissible Payment Terms.

    1.9    Person or person – Any individual, corporation, partnership, limited liability company, trust, estate or other entity.

    1.10    Qualified Lead – Lead Contact Information for a unique individual that (i) is delivered to DP in real or near real time of lead generation (lead generation for this purpose means the period of time between the original submission click by the prospective student and the time that the Lead Contact Information reaches DP's lead processing system); (ii) includes a request for information regarding an EDMC Institution or was generated for the sole purpose of obtaining information regarding an EDMC Institution; (iii) is not a False Lead; (iv) is not a Duplicate Lead; (v) is not an Incentivized Lead; (vi) meets the minimum high school graduation year requirement and/or the highest education level requirement for the applicable school location and program of interest; (vii) contains all of the following data elements (all of which must be accurate in all material respects): first and last names; street address; city, state and zip/postal code; email address (individual must be able to receive emails at this address); primary telephone number (telephone number must be in service at the time the telephone number is first dialed by DP, EDMC or any agent of DP or EDMC; the following will not qualify: fax number instead of telephone number; special information tone; wrong party; and/or otherwise invalid telephone number); year of high school graduation/highest education level attained; program of interest; and location of interest; (viii) is properly coded by Vendor using the coding requirements provided to Vendor by DP from time to time; (ix) contains such additional data elements as DP may require from time to time upon notice to Vendor; and (x) contains such other information and/or meets such other requirements as may be required by the applicable Insertion Order. Vendor acknowledges and understands that (1) DP and/or EDMC may verify or confirm that Lead Contact Information constitutes a Qualified Lead and/or (2) DP and/or EDMC may engage one or more third party service providers to verify or confirm that Lead Contact Information constitutes a Qualified Lead and/or to determine Vendor's compliance with the terms of this Agreement. Any determination by any DP, EDMC and/or such third party service provider that Lead Contract Information does not constitute a Qualified Lead shall be conclusive and binding on Vendor.

1.11 Qualified Transfer – A Qualified Lead whereby the person who is the subject of the Qualified Lead is call transferred to EDMC from Vendor or a Vendor agent.

1.12 Significant Regulatory Event – (a) any notice or other communication (in writing or otherwise) from any governmental or nongovernmental entity or any other person regarding any actual, alleged, possible or potential violation of or failure to comply with any federal, state, foreign, and/or accrediting agency laws, rules, and/or regulations and (b) any threatened or pending investigation, audit, or review with respect to compliance with any federal, state, foreign, and/or accrediting agency laws, rules, and/or regulations, in both cases including but not limited to any action under the civil False Claims Act, 31 U.S.C. § 3729 et seq. or any similar or successor statute, the Higher Education Act of 1965, as amended, or any similar or successor statute, and any state consumer protection law.

1.13 Source Data – Information solicited by Vendor and generated, input or otherwise transmitted by end users yielding Lead Contact Information, Qualified Leads and/or Qualified Transfers pursuant to this Agreement.

1.14 Vendor Creative Content - Graphical and text images, graphical and text newsletters, printed material, documents, marks, logos, videos, electronic recordings, photographs, slides, themes, scripts, micro-sites, websites and other materials that are directly or indirectly used by Vendor or any Vendor Subcontractor to generate Lead Contact Information and which does not constitute EDMC Creative Content. Upon request, Vendor shall provide DP with a copy of the Vendor Creative Content.

1.15 Vendor Subcontractor – Each of Vendor's publishers, affiliates, partners, suppliers and/or subcontractors (collectively, the "Vendor Subcontractors").

2. OWNERSHIP AND USE OF EDMC CONTENT

2.1 DP or EDMC may provide information to Vendor regarding the EDMC Institutions for use by Vendor in generating EDMC Creative Content, Vendor Creative Content and/or in generating Lead Contact Information. This information may include Intellectual Property, specifications, descriptions, special promotions, logos, claims, creative material, privacy statements and any other appropriate marketing content (such information, together with any other creative element(s) provided by DP or EDMC to Vendor pursuant to this Agreement is referred to herein as "EDMC Content"). Under no circumstances shall Vendor sell, lease, assign, sublicense, use, disclose or transfer the EDMC Content except as expressly provided in this Agreement.

2.2 Vendor shall provide the EDMC Creative Content to DP for approval. If DP or EDMC rejects any EDMC Creative Content, Vendor will revise and submit the revised EDMC Creative Content until approval has been secured. Vendor shall not use any EDMC Creative Content until it is approved by EDMC or DP. DP and EDMC reserve the right to reject any and all EDMC Creative Content for any reason or no reason. The approved EDMC Creative Content shall not be used by Vendor or any other Person except for the purposes contemplated by this Agreement.

4

2.3    All EDMC Creative Content and all Vendor Creative Content must comply with (a) the terms of this Agreement, (b) all applicable laws, rules and regulations, and (c) all policies and procedures provided by DP or EDMC to Vendor from time to time (collectively, the "Marketing Policies and Procedures"); provided, however, that DP or EDMC will provide Vendor with at least three (3) days prior notice of any new Marketing Policies and Procedures or any change to existing Marketing Policies and Procedures.  The Marketing Policies and Procedures include, without limitation, the policies and procedures included in the publication titled "EDMC – Education Management Corporation - Business Practices Committee Marketing Compliance Handbook" and "EDMC's Partner's Guide to Proactive Compliance," as each may be amended from time to time (copies of which have been provided to Vendor).

In addition, and without limiting the prior paragraph, Vendor further agrees that the quality of all its and the Vendor Subcontractors' advertising, marketing and/or promotion using the EDMC Content, the EDMC Creative Content and/or the Vendor Creative Content (including any websites used in connection therewith) will be at a level determined to be acceptable to DP and/or EDMC in its reasonable judgment and, in any event, at a level at least as high as industry standards.  Without limiting the generality of the foregoing sentence, for purposes of this Agreement, any website which a reasonable person would consider pornographic, obscene, libelous, profane, exploitative of a minor, expressing hate or tending to ridicule or embarrass, or that is abusive, offensive, defamatory or harassing, or which violates or encourages others to violate any applicable law, is not acceptable to DP and EDMC.  If the quality of Vendor or any Vendor Subcontractor's advertising, marketing and/or promotion using the EDMC Content, the EDMC Creative Content and/or the Vendor Creative Content (including any websites used in connection therewith) is not acceptable to DP or EDMC in its reasonable judgment, DP or EDMC may provide notice to that effect to Vendor (which notice shall identify the offending advertising, marketing and/or promotion (and/or websites).  Upon receipt of such a notice, Vendor will cease any such advertising, marketing and/or promotion (and/or use of any such websites) within three (3) business days.  For the avoidance of doubt, Vendor shall not be deemed to have violated or breached this paragraph if it complies with the prior sentence.

A violation or breach by Vendor or any Vendor Subcontractor of this Section 2.3 is referred to herein as a "Marketing Violation."  Vendor agrees to work in good faith work to immediately correct any Marketing Violation.  Upon each Marketing Violation, DP or EDMC may notify the Vendor of the Marketing Violation by a notice substantially in the form attached hereto and incorporated by reference herein as Schedule B.

2.4    Any amounts owed by EDMC to Vendor during a month pursuant to this Agreement shall be discounted by one percent (1%) for each Marketing Violation by Vendor during such month for which DP or EDMC send Vendor the notice in the form attached hereto and incorporated by reference herein as Schedule B.  Notwithstanding the foregoing, the total discount for Marketing Violations for any given billing cycle may not exceed ten percent (10%).  This Section 2.4 shall not limit any rights or remedies that may be available to DP or EDMC due to a breach by Vendor of Section 2.3.

2.5    Vendor will correct all errors in EDMC Content, EDMC Creative Content or Vendor Creative Content brought to its attention within one (1) business day.  Vendor further

agrees not to use DP's or EDMC's name or any derivative thereof for or in a website address (or "URL") without DP's written permission.

2.6 All EDMC Creative Content shall be considered "works made for hire" as defined in the United States Copyright Act, 17 U.S.C. § 101 et seq. for EDMC and, accordingly, all copyright interest in and to the EDMC Creative Content shall belong exclusively to EDMC. To the extent that ownership of any EDMC Creative Content does not automatically vest in EDMC by virtue of this Agreement or otherwise, Vendor hereby irrevocably assigns to EDMC all right, title and interest in and to such EDMC Creative Content and all protectable elements, contributions, enhancements, collective works thereof and derivative works thereto, and agrees to take all reasonable actions that EDMC or DP requests to ensure that all such rights, title and interest in the EDMC Creative Content vest in EDMC.

If Vendor engages or otherwise uses any third party to prepare or to assist in the preparation of EDMC Creative Content, Vendor shall have such third party execute a written agreement providing that all such EDMC Creative Content are "works made for hire" as defined in the United States Copyright Act, 17 U.S.C. § 101 et seq. for EDMC and, accordingly, all copyright interest in and to the EDMC Creative Content shall belong exclusively to EDMC. The agreement shall also provide that, in the event the EDMC Creative Content is deemed not to constitute "works made for hire" for EDMC, the third party irrevocably transfers and assigns to EDMC all rights, title and interest in and to the EDMC Creative Content and all protectable elements, contributions, enhancements, collective works thereof and derivative works thereto, and agrees to take all reasonable actions and do all things necessary or desirable to ensure that all such rights, title and interest in the EDMC Creative Content vest in EDMC. To the extent Vendor already has these agreements in place, Vendor is not required to use the exact language of this paragraph in its contracts with such third parties in order to satisfy the foregoing obligation, so long as such alternative language protects EDMC to the same extent as the language set forth in this paragraph.

2.7 Schedule A, attached hereto and incorporated by reference herein, sets forth a list of EDMC trademarked terms and prohibited keyword terms ("TM Terms"). DP from time to time may update Schedule A upon at least three (3) days prior notice to Vendor.

Vendor and the Vendor Subcontractors will not purchase TM Terms or any trademarks or copyrighted materials of any third party ("Third Party TM Terms") or any words or terms ("Prohibited Terms") that (a) include any of the TM Terms or the Third Party TM Terms (whether before or after or between other words or terms (e.g., "Art and Institute" is prohibited)) or (b) include misspellings, abbreviations, plurals or other derivatives of the TM Terms or the Third Party TM Terms (e.g., "Art Institutes" is prohibited), on any keyword based directory or listing services, including without limitation major search engines, vertical subject specific directories, local search listings where listings are purchased for a flat fee or other Pay-Per-Click (PPC) or pay-per-action advertising channels. Also, Vendor and the Vendor Subcontractors will not bid or pay for the use of the TM Terms, Third Party TM Terms or the Prohibited Terms in any paid placement search engine advertising or URL, including, without limitation, use of the TM Terms, Third Party TM Terms and/or Prohibited Terms in any ad copy that appears as a result of a keyword search. Accidental or unintended bidding on TM Terms, Third Party TM Terms or the Prohibited Terms as a result of broad matching is also prohibited (e.g., a breach of

this Agreement occurs if a search for a generic keyword such as "Atlanta art school" yields, as a result of broad matching, a Vendor ad that includes a TM Term or Prohibited Term such as "The Art Institute of Atlanta").

Vendor and the Vendor Subcontractors shall implement exclusionary placement techniques to prevent the TM Terms, the Third Party TM Terms and the Prohibited Terms from being displayed in any search engine result, including, at a minimum, use of campaign negative keyword selections for all TM Terms within all paid placement accounts.

2.8     A violation by Vendor or any Vendor Subcontractor of Section 2.7 is referred to herein as a "Trademark Violation." Vendor agrees to work in good faith to correct any Trademark Violation immediately. Upon each Trademark Violation, DP may notify the Vendor of the Trademark Violation by a notice substantially in the form attached hereto and incorporated by reference herein as Schedule C.

2.9     From the time of notification by DP or EDMC to Vendor of the first (1st) Trademark Violation during a given month, Vendor will have one (1) business day to correct the Trademark Violation. For such first (1st) Trademark Violation during a given month for which Vendor does not make timely corrective action, any amounts owed by EDMC to Vendor during such month pursuant to this Agreement with respect to Qualified Leads or Qualified Transfers for the EDMC brand (campus based and online) that is the subject of the Trademark Violation shall be discounted by five percent (5%). For example, if a Trademark Violation that is not timely corrected during July 2012 relates to EDMC's "Argosy" brand (campus based or online), the discount will apply to all amounts owed Vendor with respect to Qualified Leads or Qualified Transfers for EDMC's "Argosy" brand (campus based and online) during July 2012, but no discount will apply to any amounts owed Vendor with respect to Qualified Leads or Qualified Transfers for any of EDMC's other brands.

From the time of notification by DP or EDMC to Vendor of a second (2nd) Trademark Violation during a given month, Vendor will have one (1) business day to correct the Trademark Violation. For such second (2nd) Trademark Violation during a given month for which Vendor does not make timely corrective action, any amounts owed by EDMC to Vendor during such month pursuant to this Agreement with respect to Qualified Leads or Qualified Transfers for the EDMC brand (campus based and online) that is the subject of the second Trademark Violation shall be discounted by five percent (5%) (or an additional five percent (5%) if the first Trademark Violation related to the same EDMC brand).

Upon notification by DP or EDMC to Vendor of any Trademark Violation during a given month after the application of the five percent (5%) discounts provided by the prior two paragraphs, any amounts owed by EDMC to Vendor during such month pursuant to this Agreement for all EDMC brands shall be discounted by five percent (5%) for each Trademark Violation. For example, if Vendor has four (4) Trademark Violations during July 2012 after failing to timely correct the first two Trademark Violations during July 2012, any amounts owed by EDMC to Vendor during July 2012 shall be reduced by twenty percent (20%).

2.10.   Notwithstanding anything to the contrary contained herein, provided that Vendor has complied with the requirements of the last paragraph of Section 2.7, a Trademark Violation

shall not result in a discount to the amounts owed Vendor where a TM Term, Third Party TM Term or Prohibited Term appears as a result of an unavoidable broad match result, a change in a PPC provider's algorithm, or other similar event; provided, however, that in any such case, Vendor's advertisement (e.g., ad unit, text ad, ad copy, logo, etc.) that is served in response to a search query may not display any TM Terms, Third Party TM Term or Prohibited Terms.

2.11 Notwithstanding anything to the contrary contained herein, Vendor acknowledges and agrees that DP will not accept and EDMC will not pay for any Qualified Leads or Qualified Transfers from any of the Persons listed on Schedule D, attached hereto and incorporated by reference herein, without prior written approval from DP. DP has the right to update Schedule D from time to time during the term of this Agreement upon at least three (3) days prior notice to Vendor. Any breach by Vendor of this Section 2.11 shall subject Vendor to the provisions of Section 2.4 of this Agreement as if such breach were a Marketing Violation.

3. INTELLECTUAL PROPERTY LICENSES

3.1 Subject to the terms of this Agreement and solely for the term of this Agreement, EDMC hereby grants to Vendor a limited, revocable, non-exclusive, non-transferable, royalty-free, worldwide license to use (a) the EDMC Content and (b) the EDMC Creative Content, without the right to sublicense except as expressly provided by this Agreement, solely for the purpose of Vendor performing under this Agreement. Subject to terms of this Agreement, Vendor may sublicense the license granted to it pursuant to this Section 3.1 to the Vendor Subcontractors.

Vendor hereby acknowledges and agrees that, and Vendor shall cause each Vendor Subcontractor to acknowledge and agree that: (a) the EDMC Content and EDMC Creative Content are the exclusive property of EDMC, (b) EDMC shall retain ownership of all rights whatsoever in the EDMC Content and EDMC Creative Content, (c) Vendor and Vendor Subcontractors will not remove or destroy any patent, copyright, trade secret, proprietary or other legends or markings placed upon or contained or embedded within any EDMC Content or EDMC Creative Content, and (d) Vendor and Vendor Subcontractors shall not challenge or assist a third party in challenging the validity or ownership of the EDMC Content or EDMC Creative Content. The license granted under this Section 3.1 (and any sublicense granted to a Vendor Subcontractor) will terminate automatically upon the expiration or termination of this Agreement for any reason.

Notwithstanding anything to the contrary contained in this Agreement, DP or EDMC may limit, suspend or terminate such license at any time during the term of the Agreement upon written notice to Vendor. Except for the rights expressly granted herein, Vendor agrees and acknowledges that this Agreement does not transfer to Vendor or any Vendor Subcontractor or grant any rights to Vendor or any Vendor Subcontractor in or to the Intellectual Property.

4. LEAD CONTACT INFORMATION, SOURCE DATA AND OPERATIONAL SERVICE REQUIREMENTS

4.1 Vendor agrees that once Lead Contact Information is submitted by the end-user requesting information from an EDMC Institution, Vendor shall immediately transmit said

8

request to DP within seventy-two (72) hours, provided that Vendor shall not intentionally withhold any request to avoid any limits or caps within this Agreement.

4.2     Vendor shall supply all Lead Contact Information in compliance with and in the format specified by the policies and procedures provided by DP or EDMC to Vendor from time to time. All information provided by Vendor as to Lead Contact Information quality or status must be maintained by Vendor in strictest confidence and used only to benefit EDMC.

4.3     Vendor and each Vendor Subcontractor will maintain Source Data and Lead Contact Information in accordance with all applicable laws, rules and regulations. Vendor and each Vendor Subcontractor will maintain and enforce security procedures and standards with respect to the access and maintenance of data, including Source Data and Lead Contact Information, and will provide reasonably appropriate technical and organizational safeguards against accidental or unlawful destruction, loss, alteration or unauthorized disclosure or access of data, including Source Data and/or Lead Contact Information. Vendor and each Vendor Subcontractor will take reasonable security measures (but in no event measures less than those considered to be industry standard) to secure and defend its location and equipment against "hackers" and others who may seek, without authorization, to modify or access computer systems or the information found therein without the consent of Vendor or Vendor Subcontractor, as the case may be. Vendor and each Vendor Subcontractor will periodically test its systems for potential areas where security could be breached. If a security breach occurs, Vendor and the appropriate Vendor Subcontractor(s) will be responsible for complying with all applicable laws pertaining to such a security breach. To the extent permitted by applicable law, Vendor and the appropriate Vendor Subcontractor(s) shall provide DP and EDMC with a copy of any communication sent in compliance with said laws for approval (which shall not be unreasonably withheld). If Vendor or a Vendor Subcontractor identifies a deficiency in its security procedures and standards, then such Person shall immediately notify DP and EDMC in writing.

4.4     Vendor and each Vendor Subcontractor will: (a) disclose to all individuals who submit Source Data (prior to submission): (i) that all personal information collected will be shared with EDMC and its affiliates and agents (including DP); and (ii) how all personal information will be used; (b) comply with any and all implicit or explicit privacy representations made to such individuals regarding the use of their personal information; (c) obtain express consent for any use, disclosure and/or processing of the personal information from any non-US resident who submits Source Data (prior to submission); and (d) include a notice on any and all websites under such Person's ownership or control stating: "THIS SITE IS RESTRICTED TO USERS WHO ARE THIRTEEN (13) YEARS OF AGE OR OLDER" or substantially similar language.

4.5     Vendor agrees that all employees and agents of Vendor or any Vendor Subcontractor who perform services in connection with or related to this Agreement shall have the proper skill, training and background so as to be able to perform in a competent and professional manner and in accordance with generally accepted industry practices. Vendor agrees to remove and to cause any Vendor Subcontractor to remove from DP and/or EDMC's account any employee or agent who has engaged in willful misconduct or has committed a material breach of this Agreement immediately after Vendor or any Vendor Subcontractor becomes aware

9

of such breach. Within a reasonable period, but not later than thirty (30) days after Vendor's receipt of notice from DP or EDMC that, in DP or EDMC's reasonable judgment, the continued assignment to DP and/or EDMC, Vendor shall remove or shall cause the Vendor Subcontractor to remove such employee or agent from DP and/or EDMC's account. Nothing in this Section 4.5 shall be deemed to require Vendor or any Vendor Contractor to terminate the employment or independent contractor relationship of such employee or agents. Vendor or the Vendor Subcontractor will assume all costs and expenses associated with the replacement of any employee or agent, whether requested by DP, EDMC or otherwise, including costs and expenses associated with "knowledge transfer," integration and training of replacement personnel.

5.    REPRESENTATIONS AND WARRANTIES

5.1    Representations and Warranties and Covenants of Vendor. Vendor represents and warrants to DP and EDMC, as of the Effective Date and during the term of this Agreement, and/or covenants and agrees that:

(a) Vendor and each Vendor Subcontractor is duly organized, validly existing and in good standing and is duly qualified and licensed to do business and to carry out its and their obligations under this Agreement, and that the execution, delivery and performance of this Agreement does not violate any existing agreement to which Vendor or any Vendor Subcontractor is a party or by which Vendor or any Vendor Subcontractor is bound;

(b) Vendor has all right, title and interest necessary to grant the licenses granted by Vendor under this Agreement (if any);

(c) Vendor and/or each Vendor Subcontractor's services under or in connection with this Agreement, including, but not limited to, the EDMC Creative Content (if any) and the Vendor Creative Content, and the use of either by EDMC or DP, do not and will not infringe, violate or misappropriate any third party's intellectual property rights, including but not limited to (i) violations of the Lanham Act, (ii) infringement of any patents, trademarks, trade dress, and/or copyrights, and (iii) misappropriation of trade secrets;

(d) Vendor will not use or allow any third parties to use the EDMC Content or the EDMC Creative Content (if any) for purposes other than fulfilling Vendor's obligations under this Agreement without express written permission from EDMC;

(e) the EDMC Creative Content (if any) and the Vendor Creative Content will not be false or misleading (including, but not limited to, containing misrepresentations, misleading omissions, or false statements) and will not contain any content that is in any way libelous, harmful, obscene, harassing, or racially, ethnically, or otherwise objectionable to a reasonable person;

(f) the content and other deliverables produced by Vendor for DP or EDMC (if any) do not and will not contain any viruses, Trojan horses, worms, time bombs, spyware or other malware or any other computer programming devices that may damage in any material respect DP's or EDMC's systems or data, extract information from DP's or EDMC's systems or data or prevent DP or EDMC from operation or use of its systems or data in the ordinary course;

(g) Vendor and each Vendor Subcontractor, and all activities of Vendor and each Vendor Subcontractor related to telemarketing, Internet marketing, Vendor's business and each Vendor Subcontractor's business and/or this Agreement, does not and will not violate any applicable foreign, federal, state and/or local laws, rules or regulations, including, but not limited to, The Federal CAN-SPAM Act of 2003, the Gramm-Leach-Bliley Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Telemarketing Sales Rule, any laws, rules or regulations relating to unsolicited electronic or text advertisements or messages, any other state or federal consumer protection law, the Higher Education Act of 1965, as amended, including, without limitation, prohibitions on misrepresentation, and any laws, rules and regulations pertaining to student educational records and privacy, including, without limitation, the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and regulations thereunder at 34 CFR Part 99;

(h) except as expressly authorized by DP or EDMC in writing, Vendor and the Vendor Subcontractors will not make any representations, warranties or other statements concerning DP or EDMC to any Person;

(i) Vendor and the Vendor Subcontractors will not make any statement to an individual (verbally, electronically or otherwise) which states or implies that the individual is guaranteed to receive information from EDMC, to be enrolled in or admitted to any EDMC Institution, or to receive any other benefit or opportunity from EDMC or any EDMC Institution, including but not limited to financial assistance;

(j) Vendor and the Vendor Subcontractors do not and will not charge consumers any fee in connection with or in any way related to the consumers' receipt of information regarding EDMC (e.g., the Vendor or a Vendor Subcontractor may not charge consumers a fee for entering self reported personal information on Vendor's Website or the Vendor Subcontractor's website);

(k) Vendor and the Vendor Subcontractors are solely responsible for excluding from any telemarketing call, text message or email those customers who opted out of receiving such from Vendor or Vendor Subcontractor, as applicable, or from DP or EDMC (information regarding opt outs from DP or EDMC is available by checking the suppression file at the location designated to Vendor by DP or EDMC from time to time);

(l) Without limiting the generality of Section 5.1(a) through (k), Vendor further represents and warrants that it and each Vendor Subcontractor is familiar with the federal, state and/or accrediting agency laws, rules and/or regulations relating to the compensation of persons engaged in student recruiting activities, as each may be amended from time to time, including without limitation those set forth in the federal Higher Education Act at 20 U.S.C. Section 1094(a)(20) and in regulations promulgated by the U.S. Department of Education at 34 C.F.R. Section 668.14(b)(22), and Vendor represents, warrants, covenants and agrees that it does and will continue to compensate all of its employees and agents, and that each Vendor Subcontractor does and will continue to compensate all of the Vendor Subcontractor's employees and agent, in strict compliance with all such laws, rules and/or regulations and in such a manner that neither EDMC nor DP (to the extent such laws, rules and/or regulations are applicable to DP) will be in violation of any such laws, rules and/or regulations as a result of the activities of Vendor or any Vendor Subcontractor;

(m) Vendor and the Vendor Subcontractors (a) have not been terminated under section 432 of the Higher Education Act of 1965 for a reason involving the acquisition, use, or expenditure of federal, state, or local government funds, (b) have not been administratively or judicially determined to have committed fraud or any other material violation of law involving federal, state, or local government funds, and (c) shall not assign any individual to perform services under this Agreement who has been (i) convicted of, or pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of federal, state, or local government funds or (ii) administratively or judicially determined to have committed fraud or any other material violation of law involving federal, state or local government funds. Vendor or Vendor Subcontractor, as applicable, shall notify DP and EDMC immediately if Vendor or Vendor Subcontractor, as applicable, is terminated under section 432 of the Higher Education Act of 1965 for a reason involving the acquisition, use, or expenditure of federal, state, or local government funds or is administratively or judicially determined to have committed fraud or any other material violation of law involving federal, state or local government funds;

(n) Neither Vendor nor any Vendor Subcontractor has been, or had any principal or affiliate (as the terms "principal" and "affiliate" are defined in 2 C.F.R. pts. 180 and 3485, and as they were defined prior to April 27, 2012 in 34 C.F.R. pt. 85) that has been, debarred or suspended under Executive Order 12549 (3 C.F.R., 1986 Comp., p. 189) or the Federal Acquisition Regulations, 48 C.F.R. pt. 9, subpt. 9.4, or engaging in any activity that is a cause under 2 C.F.R. § 180.700 or § 180.800 (or a cause under 34 C.F.R. § 85.305 or § 85.405 prior to April 27, 2012), as adopted at 2 C.F.R. § 3485.12, for debarment or suspension under Executive Order 12549 (3 C.F.R., Comp., p. 189) or the Federal Acquisition Regulations, 48 C.F.R. pt. 9, subpt. 9.4, and Vendor or Vendor Subcontractor, as applicable, shall notify DP and EDMC immediately if Vendor or Vendor Subcontractor, or any principal or affiliate of Vendor or Vendor Subcontractor, has been so debarred or suspended;

(o) Vendor and Vendor Subcontractors shall notify DP and EDMC immediately regarding any Significant Regulatory Event; and

(p) Vendor may use Vendor Subcontractors to perform services under this Agreement for Vendor; provided, however, that Vendor shall be responsible for any act or omission of such Vendor Subcontractors under this Agreement and for performance under this Agreement by such Vendor Subcontractors.

5.2     Representations and Warranties of DP. DP represents and warrants to Vendor as of the Effective Date and during the term of this Agreement, and/or covenants and agrees that: (a) DP is duly organized, validly existing and in good standing and is duly qualified and licensed to do business and to carry out its obligations under this Agreement, and that the execution, delivery and performance of this Agreement does not violate any existing agreement to which DP is a party or by which DP is bound; and (b) DP has all right, title and interest necessary to grant the licenses granted by DP to Vendor under this Agreement (if any).

5.3     Representations and Warranties of EDMC. EDMC represents and warrants to Vendor as of the Effective Date and during the term of this Agreement, and/or covenants and agrees that: (a) EDMC is duly organized, validly existing and in good standing and is duly qualified and licensed to do business and to carry out its obligations under this Agreement, and that the execution, delivery and performance of this Agreement does not violate any existing agreement to which EDMC is a party or by which EDMC is bound; and (b) EDMC has all right,

title and interest necessary to grant the licenses granted by EDMC to Vendor under this Agreement (if any).

EXCEPT AS EXPRESSLY PROVIDED HEREIN, DP AND EDMC MAKE NO WARRANTIES (INCLUDING NON-INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), GUARANTIES, REPRESENTATIONS, PROMISES, STATEMENTS, ESTIMATES, CONDITIONS OR OTHER INDUCEMENTS, OF ANY KIND, EXPRESS, IMPLIED, ORAL, WRITTEN OR OTHERWISE.

### 6.   INSERTION ORDERS; PAYMENT

6.1   From time to time during the term of this Agreement, DP may deliver Insertion Orders to Vendor. DP reserves the right to modify an Insertion Order at any time upon notice to Vendor, and such modified Insertion Order shall become effective immediately upon receipt by Vendor.

6.2   If Vendor determines that the number of Qualified Leads or Qualified Transfers will exceed the targets set forth in the applicable Insertion Order ("Excess Leads"), Vendor shall notify DP prior to the date when over-delivery is anticipated. Upon receipt of such notice, DP shall notify Vendor that DP either authorizes or does not authorize Vendor to deliver such Excess Leads (such authorized Excess Leads are referred to herein as "Approved Excess Leads") to DP. EDMC shall have no obligation to pay Vendor for Excess Leads , even if delivered to DP, unless the Excess Leads constitute Approved Excess Leads.

6.3   The fees to be paid by EDMC to Vendor will be set forth in each Insertion Order and shall comply with definition of Permissible Payment Terms in this Agreement. EDMC may pay Vendor a fee for each Qualified Lead generated by Vendor during the term of this Agreement if and only if the Vendor or any Vendor Subcontractor is engaged in no student recruitment or admissions activities, which include but are not limited to targeted information dissemination to individuals, solicitations to individuals, and direct oral communications with prospective students regarding EDMC or any EDMC Institution. EDMC will only pay for Qualified Leads or Qualified Transfers; EDMC shall not be obligated to pay for any False Leads, Incentivized Leads or Duplicate Leads. Nothing contained herein shall limit DP or EDMC from using without compensation to Vendor any Source Data and/or Lead Contact Information delivered to DP or EDMC associated with (a) non-Qualified Leads or non-Qualified Transfers or (b) Excess Leads that do not constitute Approved Excess Leads. UNDER NO CIRCUMSTANCES SHALL EDMC PAY OR BE OBLIGATED TO PAY VENDOR BASED ON ANY TERMS OTHER THAN THE PERMISSIBLE PAYMENT TERMS (AS DEFINED IN SECTION 1.8).

6.4   Within five (5) business days after the end of each calendar month (each calendar month, an "Invoice Period") during the term of this Agreement, DP shall deliver to Vendor an estimate of the Qualified Leads or Qualified Transfers generated by Vendor during the Invoice Period (each, a "Lead Count"). Within five (5) business days following receipt of the Lead Count, Vendor will notify DP of any disputes regarding the Lead Count. Any dispute shall be

resolved by referring to DP's Lead Count unless another resolution is agreed upon in writing by DP and Vendor.

6.5    Vendor shall invoice EDMC based on the Lead Count described in Section 6.4. EDMC shall pay Vendor based on the Lead Count within thirty (30) days after receipt of Vendor's invoice. EDMC shall not be required to pay for any Qualified Leads or Qualified Transfers not reflected on a Lead Count. The parties acknowledge and agree that DP may not be able to determine if a lead generated by Vendor during a month constitutes a Qualified Lead or a Qualified Transfer until the month after the month during which the lead was generated (e.g., leads generated on the last day of the a month). Notwithstanding anything to the contrary contained herein, if DP determines that a lead included in a Lead Count is not a Qualified Lead or a Qualified Transfer (each, a "Credit Lead"), DP shall provide notice to that effect to Vendor and if (a) EDMC has not yet paid for the Credit Lead, EDMC shall not be required to pay for such Credit Lead, or (b) EDMC has paid for the Credit Lead: (i) EDMC may reduce from the amount it owes Vendor in any subsequent month the cost of such Credit Lead or (ii) at DP's or EDMC's request, Vendor will refund to EDMC the cost of the Credit Lead. For example, if a lead is received on May 31, included in the Lead Count for May and paid for by EDMC, but is later determined by DP not to be a Qualified Lead, EDMC may reduce the cost of the lead from the amount otherwise owed Vendor in a later month. DP will notify Vendor of all Credit Leads for each month within thirty-five (35) calendar days following the last day of the applicable month. Within five (5) business days following notice of a Credit Lead, Vendor will notify DP of any disputes regarding the Credit Lead. Any such dispute shall be resolved by the parties in good faith. For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, DP shall have no obligation to make any payment to Vendor for Qualified Leads or Qualified Transfers.

6.6    All fees paid by EDMC are inclusive of any sales, use, excise or other taxes or assessments, if any, that may be assessed by any governmental authority.

6.7    Vendor's invoice must include the following information, clearly legible, to be accepted for payment by EDMC:

6.7.1    Name and address of Vendor;

6.7.2    Invoice Period (month);

6.7.3    Brand Designation (e.g., The Art Institute of Pittsburgh – Online Division, Argosy University Online Programs, South University Online) (abbreviations approved by DP are acceptable);

6.7.4    Number of Qualified Leads or Qualified Transfers, cost per lead or transfer, and total fee being invoiced for each source code utilized for submission; and

6.7.5    Total Qualified Leads or total Qualified Transfers, and total fee for all source codes.

7.    CONFIDENTIAL INFORMATION

7.1     Each of DP, EDMC and Vendor hereby agree that, during the term of this Agreement and thereafter, except as required to perform its obligations or exercise its rights hereunder or as permitted by this Agreement, it shall not disclose to any person or otherwise use or exploit any of the Confidential Information (as defined below) of the other parties and shall hold Confidential Information of the other parties in strict confidence. Each party agrees that it shall notify the disclosing party immediately upon discovery of any unauthorized use or disclosure of the disclosing party's Confidential Information, and shall cooperate in every reasonable way to assist the disclosing party to regain possession of Confidential Information and prevent its further unauthorized use and/or disclosure.

7.2     Without limiting the generality of the foregoing, except as expressly authorized by the disclosing party, the receiving party shall: (a) limit access to any Confidential Information of the disclosing party received by the receiving party to its employees, agents, and consultants who have a need-to-know in connection with the business transactions contemplated under this Agreement, and only for use in connection therewith; (b) advise its employees, agents, and consultants having access to the Confidential Information of the disclosing party of the proprietary and/or confidential nature thereof and of the obligations set forth in this Agreement; (c) take appropriate action by instruction with its employees, agents, and consultants having access to the Confidential Information of the disclosing party to fulfill the receiving party's obligations under this Section; (d) safeguard all Confidential Information of the disclosing party received by the receiving party using at least the degree of care used by the receiving party in safeguarding its own similar information or material, but in no event less than a reasonable amount of care; (e) use all Confidential Information of the disclosing party received by the receiving party solely for purposes of carrying out the business transactions between the parties contemplated by this Agreement and for no other purpose whatsoever.

7.3     For purposes of this Agreement, "Confidential Information" shall mean all nonpublic information of disclosing party that should reasonably be understood, because of legends or other markings, the circumstances of disclosure, or the nature of the information itself, to be proprietary and confidential to the disclosing party, an affiliate of the disclosing party or a third party. "Confidential Information" also includes proposals, business plans, financial information, personnel information and contract information, properties, methods of operation, software, trade secrets, inventions, discoveries, know-how and other intellectual property, including any information that was disclosed by any party prior to the date hereof as well as information currently provided and to be provided during the term of this Agreement. In addition, and notwithstanding anything to the contrary contained in this Agreement, the terms of this Agreement shall be deemed the Confidential Information of DP and EDMC. Notwithstanding anything to the contrary contained herein other than the prior sentence, "Confidential Information" shall not include any information that (i) is generally known to the public or to the disclosing party's competitors at the time of disclosure hereunder or thereafter becomes generally known to the public or to the disclosing party's competitors through no fault of the receiving party; (ii) can be shown by the receiving party to have been in its possession prior to disclosure hereunder; (iii) is furnished to the receiving party by a third party without breach of a confidentiality obligation; or (iv) can be shown by the receiving party to have been independently developed without reference to Confidential Information of another party.

7.4    Except as expressly provided by this Agreement, all Confidential Information disclosed under this Agreement shall be and remain the property of disclosing party. Unless otherwise provided in this Agreement, Confidential Information in tangible form shall be returned or destroyed promptly, at the receiving party's option, upon written request or the termination or expiration of this Agreement, and shall not thereafter be retained in any form by the receiving party, its affiliates, or any employees or independent contractors of the receiving party.

7.5    Each of DP, EDMC and Vendor hereby acknowledge and agree that a breach of this Section 7 will cause the disclosing party irreparable injury, which cannot be reasonably or adequately compensated for with damages in an action at law. Accordingly, in addition to whatever other rights the disclosing party may have to damages or other relief, such disclosing party shall be entitled to injunctive and other equitable relief in connection with or related to any such breach (without any requirement to post a bond or other security).

7.6    Notwithstanding anything to the contrary contained herein, any party may disclose Confidential Information of another party to the extent required to be disclosed by law, regulation, or other act of governmental authority, provided that, to the extent permitted by applicable law, the receiving party shall use reasonable efforts to give written notice of such requirement to the disclosing party as far in advance as possible prior to disclosure. In any such case, upon the reasonable request of the disclosing party and to the extent permitted by applicable law, the receiving party shall cooperate with the disclosing party (at the disclosing party's sole cost and expense) in seeking to obtain a protective order with respect to such Confidential Information.

## 8.    INSURANCE

8.1    Vendor shall obtain and maintain at its own cost and expense Advertising Liability Insurance with statutory limits of coverage not less than $5,000,000 per occurrence. If Vendor's insurance is "claims made", the policy retroactive date shall be effective prior to the Effective Date and upon termination of this Agreement, Vendor shall maintain such insurance for at least twenty-four (24) months after the termination of this Agreement or shall purchase tail coverage for at least a twenty-four (24) month period. DP may require the Vendor Subcontractors to maintain the same insurance required of Vendor pursuant to Section 8.1.

8.2    Upon request, Vendor shall provide to DP all certificates of insurance required by this Section 8. All insurance required by this Section 8 shall name DP and EDMC as additional insureds. Vendor shall provide DP with ten (10) days advance written notice prior to the cancellation or material change to any insurance required by this Section 8. The fulfillment of the insurance obligations in this Section 8 shall not relieve Vendor of any liability under this Agreement or Vendor's obligations to indemnify DP, EDMC or any DP/EDMC Affiliated Party (as defined in Section 9.1) as required by Section 9.

## 9.    MUTUAL INDEMNIFICATION

9.1    Vendor shall indemnify, hold harmless, and defend each of DP and EDMC and, as appropriate, each of DP and EDMC's officers, directors, employees, agents, shareholders,

16

members, successors and assigns (each, a "DP/EDMC Affiliated Party"), from any actions, claims, losses, liabilities, damages, fees, costs and expenses (including attorney's fees) (each a "Claim") relating to or arising out of (a) Vendor's breach of any of its representations, warranties, covenants or agreements contained in this Agreement or (b) personal injury, wrongful death, or personal property damage proximately caused by the negligence or intentional misconduct of Vendor.

DP shall indemnify, hold harmless, and defend Vendor and, as appropriate, each of Vendor's officers, directors, employees, agents, shareholders, members, successors and assigns from any Claims relating to or arising out of (a) DP's breach of any of its representations, warranties, covenants or agreements contained in this Agreement or (b) personal injury, wrongful death or personal property damage proximately caused by the negligence or intentional misconduct of DP.

EDMC shall indemnify, hold harmless, and defend Vendor and, as appropriate, each of Vendor's officers, directors, employees, agents, shareholders, members, successors and assigns from any Claims relating to or arising out of (a) EDMC's breach of any of its representations, warranties, covenants or agreements contained in this Agreement or (b) personal injury, wrongful death or personal property damage proximately caused by the negligence or intentional misconduct of EDMC.

9.2    Vendor further agrees to indemnify, hold harmless, and defend all DP/EDMC Affiliated Parties against any Third Party Claim (defined below) arising from (a) any false or misleading content (including, but not limited to, misrepresentations, misleading omissions, or false statements) published by Vendor; (b) any violation of the Higher Education Act, regulations promulgated by the U.S. Department of Education, or other applicable education laws or regulations by Vendor; and/or (c) an allegation that its services under this Agreement, including, but not limited to, the EDMC Creative Content (if any) or the Vendor Creative Content, or the use of either by EDMC or DP, infringe, misappropriate or violate any third party's intellectual property rights, including but not limited to (i) violations of the Lanham Act, (ii) infringement of any patents, trademarks, trade dress, and/or copyrights, and (iii) misappropriation of trade secrets.

9.3    Upon receiving notice of a Claim from a Person who is not a party to this Agreement (a "Third Party Claim"), the party seeking indemnification (the "Indemnified Party") shall give the indemnifying party (the "Indemnifying Party") reasonably prompt written notice thereof after becoming aware of such Third Party Claim, provided, however, that the failure to so notify the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim is prejudiced by the Indemnifying Party's failure to receive such notice. Such notice shall describe the Third Party Claim in reasonable detail and include any pleadings or correspondence available to the Indemnified Party. Subject to Section 9.4, the Indemnifying Party shall have the obligation to control the defense of any Third Claim Claim. The Indemnified Party, however, shall have the right to approve any settlement of a Third Party Claim that purports to be binding on it or include any provisions other than the payment of monetary damages (including any admissions of liability or wrongdoing on the part of the Indemnified Party) and to have advisory counsel assist with the defense of the Third Party

17

Claim at Indemnified Party's own expense. The Indemnified Party will provide all reasonable assistance requested of it by the Indemnifying Party.

9.4     Notwithstanding anything to the contrary contained in this Agreement, for any Third Party Claim in which DP, EDMC or a DP/EDMC Affiliated Party is the Indemnified Party and which relates to the alleged violation of applicable laws, rules or regulations, or for any Third Party Claim that, in DP's or EDMC's reasonable determination, could adversely affect DP's or EDMC's ongoing operations in any material respect, DP or EDMC shall have the right to control the defense of the Third Party Claim. Exercising this option shall not relieve Vendor of any other obligations imposed upon it as the Indemnifying Party under this Section 9. However, Vendor shall have the right to approve any settlement of such a Third Party Claim that purports to be binding on it or that requires the payment of money by Vendor (such approval not to be unreasonably withheld, conditioned or delayed) and to have advisory counsel assist with the defense of such Third Party Claim at Vendor's own expense.

## 10.    LIMITATION OF LIABILITY

10.1    EXCEPT AS PROVIDED IN SECTION 10.3, VENDOR AGREES THAT THE AGGREGATE LIABILITY OF DP, EDMC (AND ANY DP/EDMC AFFILIATED PARTY) TO VENDOR FOR ANY ACTION, DAMAGE, CLAIM, LIABILITY, COST, EXPENSE OR LOSS (INDIVIDUALLY AND COLLECTIVELY, A "LOSS") IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE LIMITED (I.E., MAY NOT BE MORE THAN (BUT CAN BE LESS)) TO THE LESSER OF (I) THE FEES PAID OR REQUIRED TO BE PAID BY EDMC DURING THE SIX MONTH PERIOD IMMEDIATELY PRIOR TO THE MONTH IN WHICH THE MOST RECENT EVENT GIVING RISE TO THE LOSS OCCURRED OR (II) $250,000. FOR PURPOSES OF CLARIFICATION, THIS LIMITATION OF LIABILITY IS AN AGGREGATE LIMITATION OF LIABILITY FOR THE AGREEMENT.

10.2    EXCEPT AS PROVIDED IN SECTION 10.3, IN NO EVENT SHALL DP, EDMC OR ANY DP/EDMC AFFILIATED PARTY BE LIABLE TO VENDOR OR TO ANY OTHER PERSON FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR OPPORTUNITY COSTS), EVEN IF DP OR EDMC HAS BEEN NOTIFIED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES OCCURRING OR SUCH DAMAGES COULD HAVE BEEN REASONABLY FORESEEN BY DP OR EDMC. THE PROVISIONS OF THIS SECTION SHALL APPLY REGARDLESS OF THE FORM OF LOSS, WHETHER IN CONTRACT, STATUTE, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE).

10.3    The limitations of liability set forth in Sections 10.1 and 10.2 shall not apply with respect to any of the following: (a) Losses associated with DP's or EDMC's indemnification obligations pursuant to Section 9 as a result of a Third Party Claim or (b) Losses associated with DP's or EDMC's breach of Section 7.

## 11.    TERM, TERMINATION AND EXPIRATION

18

11.1    Unless sooner terminated as otherwise herein provided, the term of this Agreement shall extend from the Effective Date through the later of June 30, 2013 or the next occurring June 30 following the Effective Date unless the parties agree otherwise in writing. Thereafter, unless sooner terminated as otherwise provided herein, this Agreement shall automatically renew for additional terms of one year (July 1 to June 30) unless any party provides each of the other parties notice of non-renewal at least 15 days prior to the end of the initial term or any renewal term. Upon termination of this Agreement for any reason, all Insertion Orders shall terminate.

11.2    Any party to this Agreement may elect to terminate this Agreement for any reason or no reason by giving one (1) day prior written notice to the other parties to this Agreement.

11.3    This Agreement may be terminated immediately by any party (a) in the event that any bankruptcy, insolvency, liquidation, dissolution, or similar action or proceeding is instituted, commenced, or acquiesced to by any other party or, if instituted or commenced involuntarily against any other party, is not stayed or dismissed within sixty (60) days after that involuntary institution or commencement, (b) if any party otherwise becomes insolvent, admits in writing its inability to pay its debts as they mature, makes a general assignment for the benefits of its creditors, or enters into any workout or similar arrangement with its creditors, or (c) if any party discontinues its business.

11.4    Termination of this Agreement shall not prevent any party from pursuing any remedy available to it in law or equity, nor shall it excuse or discharge any obligation that accrued prior to the termination date.

11.5    Upon expiration or termination of this Agreement, any property, of whatever kind or nature, whether created by this Agreement or otherwise, in the possession of a party and for which the party is not entitled by the express terms of this Agreement to continue using after the expiration or termination of this Agreement, shall, pursuant to instructions from either of the other parties, be (a) promptly returned to such other party or (b) destroyed and a certification of destruction provided to such other party. In addition, upon expiration or termination of this Agreement: (i) all rights granted to Vendor, including any non-exclusive license rights, shall terminate; and (ii) Vendor and each Vendor Subcontractor shall immediately discontinue any and all use of the EDMC Content, EDMC Creative Content, and Intellectual Property.

12.    AUDIT RIGHTS: REPORTS

12.1    DP and EDMC shall have the right to examine the books and records of Vendor in regard to and/or in connection with this Agreement at all reasonable times. During the term of this Agreement and for a period of three (3) years thereafter, Vendor shall keep complete and accurate books and records of account relating to the performance of its obligations under this Agreement. DP or EDMC may cause an audit and/or inspection to be made of the Vendor's books and records in order to verify Vendor's compliance with the terms of this Agreement. Any audit and/or inspection shall be conducted during regular business hours at Vendor's facilities upon reasonable prior notice to Vendor. Vendor shall provide DP's or EDMC's designated audit or inspection team, as applicable, access to the relevant Vendor books and records.

12.2 Vendor shall provide reports to DP containing such data and details and with such frequency as shall be reasonably requested by DP from time to time.

## 13. MISCELLANEOUS

13.1 Choice of Law. This Agreement, including, without limitation, all questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement, shall be governed by the laws of the State of Delaware, excluding any law or conflicts of law principle that would apply the law of another jurisdiction. The parties agree that any action with respect to or arising out of this Agreement shall be brought and maintained exclusively in a state or federal court of competent jurisdiction located in the State of Delaware. The parties hereby irrevocably consent to the personal jurisdiction of and venue in such courts.

13.2 Notice. All notices under this Agreement shall be in writing and shall be effective upon the earlier of actual receipt or five (5) days following deposit into the United States mail (certified mail, return receipt requested), the next business day following deposit with a nationally recognized overnight courier service, or the same day if sent by facsimile or email with confirmation of delivery to the address set forth below or such other address as any party may notify each other party from time to time in accordance with this section. Email shall constitute a writing for purposes of this Agreement.

If to Vendor: At the address, facsimile number or email address set forth on the signature page hereof.

If to DP: At the address in the introductory paragraph of this Agreement, at the following facsimile number: 410-332-1059 or email address: _____.

If to EDMC: At the address in the introductory paragraph of this Agreement, at the following facsimile number: _____ or email address: _____.

13.3 Assignment. Any party to this Agreement may assign this Agreement in whole or in part without the prior written consent of the other parties to this Agreement upon at least three (3) business days prior written notice to the other parties to this Agreement.

13.4 Severability. The provisions of this Agreement are severable, and in the event that any provision of this Agreement is determined to be invalid or unenforceable under any controlling body of law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

13.5 Entire Agreement. This Agreement, including any Exhibits and Schedules hereto and any Insertion Orders (which are deemed to be part of this Agreement), constitute the entire understanding between Vendor, DP and EDMC with respect to the subject matter hereof, and supersedes all prior agreements, arrangements, representations and communications (whether oral or written), regarding the subject matter of this Agreement. Except as may be specifically provided herein, no change, modification, amendment, addition or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of the party to be charged therewith.

13.6    Independent Contractor.  Nothing in this Agreement shall be deemed to constitute, create, give effect to, or otherwise recognize a joint venture, partnership, pooling arrangement, formal business entity or any type of permanent arrangement, and the employees of one party shall not be deemed employees of another party.  DP, EDMC and Vendor shall be acting in their respective capacities as independent contractors and under no circumstances will any party be deemed to be in any relationship with any other party carrying with it fiduciary or trust responsibilities, whether through partnership or otherwise, and no party undertakes by this Agreement or otherwise to perform any obligation of any other party, whether regulatory or contractual, or to assume any responsibility for any other party's business or operations.  Each party has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by it hereunder.  For the avoidance of doubt, Vendor acknowledges and agrees that Vendor and its employees or subcontractors shall not be entitled to any DP or EDMC benefits, including:  (a) income tax withholding; (b) 401(k) or other retirement benefits; (c) health, life, disability or dental insurance; or (d) employee stock purchase or stock option plans, and that Vendor shall be solely responsible for the withholding and payment of all taxes and insurance premiums owed by its employees, including workers' compensation insurance.

13.7    No Waiver.  No waiver of the provisions hereof shall be effective unless in writing and signed by the party to be charged with such waiver.  No waiver shall be deemed a continuing waiver or waiver in respect of any subsequent breach or default, either of a similar or different nature, unless expressly so stated in writing.

13.8    Publicity.  Neither party may publicize this Agreement or the transactions contemplated hereby or use in any manner the name or trademarks of any other party or its affiliates other than as expressly contemplated by this Agreement.

13.9    Survival.  The expiration or termination of this Agreement for any reason will not release any party from any liabilities or obligations set forth herein which (a) the parties have expressly agreed will survive any such expiration or termination or (b) remain to be performed or (c) by their nature would be intended to be applicable following any such expiration or termination.  Without limitation of the foregoing, Sections 2.6, 4.3, 7, 8.1, 9, 10, 11.5, 12 and 13 shall survive termination or expiration of this Agreement.  In addition, expiration or termination shall not extinguish any claim for breach relating to events which occurred prior to such expiration or termination.

13.10    Headings; Etc.  The headings and other captions in this Agreement are inserted for purposes of convenience only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement.  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require.

13.11    Counterparts.  This Agreement may be executed in counterparts, and each such executed counterpart so delivered shall be deemed an original instrument, and all such counterparts together shall constitute but one agreement.  Facsimile or electronic signatures shall have the same effect as original signatures.

13.12 <u>Interpretation</u>. It is expressly agreed that this Agreement shall not be construed against any party, and no consideration shall be given or presumption made on the basis of which party drafted this Agreement or any particular provision hereof or which party supplied the form of agreement. Each party agrees that this Agreement has been purposefully drawn and correctly reflects its understanding of the transaction that this Agreement contemplates. In construing this Agreement examples shall not be construed to limit, expressly or by implication, the matter they illustrate and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions.

13.13 <u>Recitals</u>. The recitals contained in this Agreement are intended to be and are part of this Agreement, and are incorporated into the Agreement by reference as if fully set forth herein.

*[Remainder of Page Intentionally Left Blank. Signatures Follow.]*

22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**VENDOR**

One On One Marketing LLC

By: _Mark H. Thomas_
Name: _Mark Thomas_
Title: _Business Development Manager_
Date: _1/7/13_

Address: _2912 Executive Pkwy_
_____Suite 300_____
_____Lehi, UT 84043_____
Facsimile: _1-801-642-0237_
Email: _mthomas@lon1.com_

**DOUBLE POSITIVE MARKETING GROUP, INC.**

By: _____
Name: _____
Title: _____
Date: _____

**EDUCATION MANAGEMENT LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Schedule A**
**TM Terms**

"Art Institute"
"Ai.com"
"Ai "
"Aii"
"Artinstitutes.edu"
"ArtSchool.com"
"Bradley Academy"
"International Culinary School"
"New York Restaurant School"
"California Design College"
"Miami International University of Art & Design"
"Illinois Institute of Art"
"New England Institute of Art"
"Argosy"
"American School of Professional Psychology"
"American School of Psychology"
"South University"
"South Online"
"Brown Mackie"
"Chapparral  College"
"Western State University of Law"

## Schedule B
## Form of Marketing Violation Notice

Date

Vendor

Re:  DoublePositive Online Marketing Agreement for EDMC Institutions (the "Agreement") –
Marketing Violation Notice

Dear Vendor:

This letter serves as notice that Vendor is in violation of Section 2.___ of the Agreement.
Attached is a screenshot of the EDMC Creative Content or the Vendor Creative Content in
question or the advertising, marketing and/or promotion in question.

Please immediately remove the EDMC Institutions from the EDMC Creative Content or Vendor
Creative Content (as those terms are defined in the Agreement) or from the advertising,
marketing and/or promotion that is in violation of Section 2.___ of the Agreement.  Also, you may
not deliver to DP any Lead Contact Information that was generated by such EDMC Creative
Content or Vendor Creative Content or from such advertising, marketing and/or promotion.

If you have any questions, please contact _____ at _____.

Thank you in advance for your cooperation in this important matter.

Very truly yours,

**Schedule C**
**Form of TM Violation Notice**

Date

Vendor

Re:  DoublePositive Online Marketing Agreement for EDMC Institutions (the "Agreement") – Trademark Violation Notice

Dear Vendor:

This letter serves as notice that Vendor is in violation of Section 2.___ of the Agreement regarding use of TM Terms, Third Party TM Terms or Prohibited Terms (as those terms are defined in the Agreement).

The url in question is www._____ and the destination url is www._____. These landing pages correspond to the violations.

Attached is a screenshot that provides an example of the violations occurring on the Internet.

In addition to the discounts that may be assessed pursuant to Section 2.___ of the Agreement, Vendor is required to correct the breach.

If you have any questions, please contact _____ at _____.

Thank you in advance for your cooperation in this important matter.

Very truly yours,

_____

## Schedule D
## Restricted Vendors